# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| EDWIN HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CV-282-TS |
| | ) | |
| NORTHEAST JUVENILE | ) | |
| CORRECTIONAL FACILITY and | ) | |
| PHILLIP GIBSON, SUPERINTENDENT, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendants' Motion for Summary Judgment, filed on May 30, 2006.

## BACKGROUND

On June 27, 2005, Plaintiff Edwin Harris sued his former employer, Northeast Juvenile Correctional Facility, and its Superintendent, Phillip Gibson, in Allen County Superior Court. The Plaintiff, invoking 42 U.S.C. § 1981 and Title VII, alleged that the Defendants discriminated against him because of his African-American race and his sex and retaliated against him for filing charges of discrimination with the National Association for the Advancement of Colored People (NAACP) and the Equal Employment Opportunity Commission (EEOC). In Count III of his Complaint, the Plaintiff alleged violation of his substantive and procedural due process rights, which the parties later stipulated to dismiss with prejudice (DE 15).

On August 15, 2005, the Defendants removed the cause to federal court and answered the Complaint. On February 8, 2006, the Defendants filed a Motion for Leave to Amend Defendants'

Answer and Statement of Affirmative Defenses by Adding the After-Acquired Evidence Defense, which the Court granted on February 27.

After the Court granted the parties' request to extend the dispositive motion deadline, the Defendants moved for summary judgment on May 30, 2006. The Plaintiff was granted an additional extension and on July 14, 2006, responded to the Defendants' Motion. On July 31, the Defendants replied.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir.

2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248–50. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Comm'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443. However, under Northern District of Indiana Local Rule 56.1(b), the Court is to assume that the facts claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent such facts are controverted in a

"Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence.

## MATERIAL FACTS

**A.      Personnel at Northeast Juvenile Correctional Facility**

Northeast, which is a high security juvenile criminal confinement facility, houses between 70 and 120 male students. The Plaintiff began his employment at the Facility in 1995 as a Youth Services Officer (YSO). His job required him to supervise students during their daily activities and movements throughout the Facility. The YSOs are supervised by and report to sergeants, who in turn report to lieutenants. The lieutenants report to the Program Director, Gary Berlin, who reports to Superintendent Gibson.

**B.      The Plaintiff's Arrests at the Facility**

Less than one year after becoming a YSO, the Plaintiff was arrested on battery charges while on duty at the Facility. The Plaintiff pleaded not guilty to the charges but, on April 14, 1997, was found guilty after a bench trial. As a result, the Plaintiff received a one-day suspension from his job duties.

On October 3, 2003, the Plaintiff was arrested, again while on duty at the Facility. He was charged with two counts of operating while intoxicated (OWI) and one count of possession of marijuana. Pursuant to Indiana Department of Correction Policy and Procedure, Superintendent Gibson put the Plaintiff on emergency suspension pending disposition of the charges.

On November 25, 2003, the Plaintiff pleaded guilty to one count of OWI. The second OWI

4

charge was dismissed as was the drug possession charge on the condition that the Plaintiff complete the Allen County Division Services Program and have no criminal activity within the year.

Thereafter, Superintendent Gibson conducted a pre-deprivation hearing and consulted with his immediate supervisor before terminating the Plaintiff's employment. During the predeprivation hearing to discuss the OWI charges, Gibson told the Plaintiff that he got a call that the Plaintiff was on the corner selling TVs for crack cocaine. When the Plaintiff asked what the comment had to do with his OWI, Gibson responded, "I just thought I would tell you." There was no other discussion regarding the remark and nothing came of it. Gibson stated in an affidavit that, in 1996, he received a call from an Indiana State Trooper who performed undercover narcotics investigations informing him that the Plaintiff's name had come up in his investigation as a person who used crack cocaine. Gibson stated that he did not act on the information because it was never substantiated or verified and that he informed the Plaintiff to demonstrate that not all accusations are acted upon because they are not substantiated or verified.

The Plaintiff challenged his termination through the union grievance process.

### C.    The Plaintiff's Reinstatement

On March 16, 2004, the Plaintiff was reinstated as a YSO through the efforts of his union. Gibson contends that, according to his conversation with Kevin Luzader, the Labor Relations Director for the IDOC, the agreement to reinstate the Plaintiff was a "last chance agreement," despite the fact that the Plaintiff did not actually agree to a last chance provision as part of his reinstatement agreement.

Sgt. Carpenter, who supervised the Plaintiff after his reinstatement, testified that he heard

from different people at the Facility that the administration did not want the Plaintiff to return and would be "on the outs for him." (Carpenter Dep. 100–01.) Sgt. Carpenter also testified that his supervisor, Ltd. Hapner, told him that he did not want the Plaintiff to return to the Facility because he thought the Plaintiff was "dirty." (Carpenter Dep. 102–03.) Sgt. Carpenter thought this sentiment was strange because Ltd. Hapner had not worked much with the Plaintiff; he was hired in the summer of 2003, shortly before the Plaintiff was suspended and terminated for the OWI offense. Sgt. Carpenter did not know what Hapner mean by dirty, but believed that it referenced being a "crooked officer." (Carpenter Dep. 103.)  Sgt. Carpenter himself did not think that the Plaintiff was dirty. (Carpenter Dep. 103–04.)

### D.      July 12, 2004, Incident with Student K.S.

On the evening of July 12, 2004, Charles Marseilles, an intern at the Facility, reported that the Plaintiff was yelling and cursing at a group of students that had just been released from a ministry event.[1] As the Plaintiff cursed at a particular student who stepped out of formation and failed to follow instructions, Sgt. Henderson put his hand on the Plaintiff's shoulder and stated "[c]alm down, we need to be better than this." (Henderson Dep. at 46–47.) The Plaintiff complied and went back to directing students.

Soon after this exchange, the Plaintiff went to Dorm #2 to check on the students. He observed student RP sit back in his bunk and attempt to hide something. When the Plaintiff confronted him, RP admitted he had a plastic shower shoe. The Plaintiff inquired where he got the

---

[1] There is a dispute whether Marseilles' accurately reported the language that the Plaintiff used with the students.

shoe and KS said that he gave RP the shoe. The Plaintiff told KS that he could write him up for getting out of bed at night, but gave KS the option to write "I will not get out of bed after lights out" 250 times. The Plaintiff escorted KS to the day room to write his sentences. The Plaintiff told Sgt. Henderson about his decision to have KS write sentences. After KS began writing sentence, the Plaintiff again informed Sgt. Henderson about the situation with KS, particularly that he was being verbally abusive.

After KS wrote some sentences, he got up from the table and stated that he was not going to write anymore. As he headed back to Dorm #2, the Plaintiff followed him and stated that he would write up both KS and RP if KS did not finish writing the sentences. KS returned to the day room to write the sentences, but again stopped before writing all 250 sentences. KS began cussing and walking back to the Dorm. The Plaintiff followed KS and told him to be quiet because other students were sleeping. After they reached the dorm, KS turned toward the Plaintiff with clenched fists. The Plaintiff grabbed KS's arms and wrapped his arms around KS's waist to take him to the ground.

YSO Yolanda Simmons came into the Dorm and attempted to secure KS's kicking legs. After they secured KS to the ground, Sgt. John Carpenter entered the room, tapped out YSO Simmons and told her to watch the other dorms. KS was still resisting but no longer flailing. He was grunting and breathing heavily. Sgt. Carpenter told KS to calm down. When KS relaxed his body, Sgt. Carpenter told the Plaintiff to leave the Dorm. Sgt. Carpenter then escorted KS to a time-out room, who continued to threaten to beat the Plaintiff but did not attempt to break away.

E.       Observations of KS After the Take Down

7

As Sgt. Carpenter took KS to the time out room he made no complaints of pain and stood up straight. Sgt. Carpenter completed a Report of Use of Physical Force form. He did not note any injury, complaints of injury, or problems that KS had breathing or walking.

About fifteen minutes later, Nurse Marion McDonald examined KS in the time-out room. In her Report of Offender Injury, Nurse McDonald noted that KS had numerous small scratches and abrasions on his upper body and that his face was reddish blue. She noted that he complained of numbness in the right axilla area and in his upper arm, and pain in his testicles. Nurse McDonald also noted her observations in an Incident Report and stated that she was concerned about the take down. Neither Nurse McDonald or any other Facility employee took pictures of KS's injuries despite a policy that required any visible student injury to be photographed.

After KS was returned to his dorm room, Sgt. Henderson met with him to complete a Use of Force Debriefing form. Sgt. Henderson testified that he did not observe any injuries, that KS did not complain of any pain and declined to make a written statement.

The next day, on July 13, 2004, the Nurse reported KS's injuries to her supervisory, Gary Berlin, in the presence of Investigation Sergeant Dennis Sorg.

**F.      Procedures and Investigation**

On the same night the incident occurred, Sgt. Henderson spoke to both the Plaintiff and Sgt. Carpenter. He concluded on the Report of Use of Physical Force form that the use of force was justified for protection of others, protection of self, and enforcement of the rules.

On July 13, 2004, three students provided witness statements regarding the previous night's events. The students claimed that the Plaintiff squeezed KS's testicles, bent his back until it popped,

and cut off his air supply. They reported that Sgt. Carpenter told the student to calm down and then told the Plaintiff to let go of the student.

The Facility files a Report of Alleged Child Abuse or Neglect with Child Protective Services (CPS) when there is suspicion of child abuse upon a student at the Facility. On July 14, 2004, Sgt. Sorg filed this Report with CPS. The next day, either Gibson or Sgt. Hapner assigned Sorg to investigate the July 12, 2004, take down of KS to determine whether the Plaintiff contacted a Sergeant before using force as required by DOC notification procedures. The Plaintiff was informed that he was under investigation for the incident with KS.

**G.      The Plaintiff's Contact with RP's Parents**

On July 16, 2004, Intern Marseilles saw the Plaintiff talking to the parents of RP, a student who provided a witness statement to Sgt. Sorg about the July 12 incident with the Plaintiff and KS. Marseilles told Sgt. Sorg that the Plaintiff was speaking to RP's parents about the incident.

After the Plaintiff finished speaking with the parents, Sgt. Sorg asked them about the content of their conversation. The parents detailed the conversation and expressed concern for the safety of RP because they felt that the Plaintiff was trying to intimidate them and their son into keeping quiet about the July 12 incident.

Sgt. Sorg asked the parents to talk to Jason Shrock, the Assistant Superintendent. RP's parents repeated their concerns to Shrock and Sgt. Sorg asked them to write a statement about their conversation with the Plaintiff. The parents wrote:

> Officer Harris had approached us, George & Lisa [last name], about an incident that happened earlier in the week with someone that [student] has been bunking with or hanging with, so to speak. It was very strange because it appeared Mr. Harris was very nervous about something. He was asking us if [student] has spoken to us about

what happened, and we told him we have not spoken to our son.

Mr. Harris continued telling us about how [student] was hanging around the wrong crowd putting him down as if he was a bad person.

We have been hearing such good things about [student], but when Mr. Harris was speaking to us he had only one good thing to say and that was that [student] has never disrespected him in any way, verbally or physically. He said the other boy, no name mentions, balled up his fist to challenge him and he had to restrain him and then later he said he delt [sic] with this boy later [and student] had witnessed it. Mr. Harris said that he wished that [student] had not witnessed it but maybe it's a good thing that he did cause maybe [student] would think twice about challenging him the way his buddy did. Mr. Harris said he was glad that he got the chance to talk with us because boys in here can exaggerate a story if they think you are buying it.

If I can recall anything else I will write it down.

(DE 21, Pf.'s Ex. 12.)

Sgt. Sorg and Shrock  relayed the parents' concerns to Gibson, who placed the Plaintiff on emergency suspension pending the outcome of Sgt. Sorg's investigation. Gibson believed that the Plaintiff might have been attempting to interfere with the investigation. Gibson told the Plaintiff that he would hold a pre-deprivation meeting on July 21, 2004. According to the Plaintiff, Gibson also shared with him again that he received a call from a State Trooper who said he saw the Plaintiff on the corner selling crack cocaine to kids.

### H.  Results of Investigation and Termination

On July 16, 2004, Sgt. Sorg completed a Report of Investigation of Incident. He detailed his findings and concluded that the Plaintiff committed seven infractions. The charges related to his purported use of abusive language, the incident with KS, and the ensuing investigation, including intimidation of a student witness and RP's parents. Superintendent Gibson contacted Kevin Luzader, the DOC Labor Relations Director, by email about the seven allegations and the predeprivation procedures he intended to follow. He also wrote:

> Based upon the allegations and support, what action would you support if I find YSO Harris to be involved in one or more of these allegations? As you may remember, this is the officer that I terminated against your advise and then had to re-hire him. He has threatened me with lawsuits, etc.

(DE 21-14.)

On July 21, Gibson conducted a predeprivation meeting. Thereafter, the Plaintiff provided a written response to all seven allegations. On August 18, Gibson again emailed Luzader with more detail about the seven allegations and the Plaintiff's responses. Luzader's response indicated that there was sufficient evidence to support five of the seven allegations and that the next logical step was termination.

On August 20, Gibson wrote a memo to the Plaintiff advising him that after conducting the predeprivation meeting and reviewing the statements and reports of the allegations against the Plaintiff, he believed that the Plaintiff committed four of the original seven violations. Gibson stated that the because of the serious nature of the allegations, the appropriate disciplinary action was dismissal. He advised the Plaintiff that he was immediately suspended for thirty days pending his dismissal, which would be effective September 18, 2004.

The Plaintiff filed a grievance with his union seeking reinstatement, but when the governor of Indiana announced a new policy regarding union settlements, the matter was turned over to a State Employees Appeal Commission. The parties do not indicate what became of the matter after the Commission's hearing on June 6, 2005.

## I.      The Plaintiff's Complaints of Discrimination

On August 9, 2004, the Plaintiff filed a charge of discrimination with the Indiana Civil Rights Commission alleging race discrimination and retaliation. On August 16, 2004, the Plaintiff

filed a Complaint of Discrimination with the NAACP. On August 21, and September 1, 2004, the

Plaintiff filed similar charges with the EEOC.[2] The Defendants received notice of the EEOC charges

on September 3 and 13. On January 17, 2005, the Plaintiff filed an amended charge of discrimination

with the EEOC to assert charges of sex discrimination, which the Defendants received notice of on

January 26.


## DISCUSSION

The Plaintiff alleges that the Defendants created a racially hostile work environment,

suspended and terminated him because of his race and in retaliation for filing charges of

discrimination, and discriminated against him on the basis of his sex, all in violation of Title VII and

42 U.S.C. § 1981.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any

individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e-2(a)(1). An employee may prove that an employer violated Title VII under either the direct

or indirect method of showing unlawful discrimination. Direct evidence "essentially requires an

admission by the decision-maker that his actions were based on the prohibited animus." *Radue v.

Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Because such admissions are rare, a

plaintiff may also "prevail under the direct method of proof by constructing a 'convincing mosaic'

of circumstantial evidence that 'allows a jury to infer intentional discrimination by the

decision-maker.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe*

---

[2] The Plaintiff also contends that he attempted to file charges of discrimination against the Facility at least three times between 1997 and 2004, but that investigators at the Metropolitan Human Relations Commission refused to process or forward these charges.

*v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994); *but see Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903–04 (7th Cir. 2006) (clarifying that circumstantial evidence need not have a mosaic-like character to preclude summary judgment but need only allow the trier of fact to infer intentional discrimination by the decisionmaker). This circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Jordan v. City of Gary,* 396 F.3d 825, 832 (7th Cir. 2005).

The Seventh Circuit has recognized three distinguishable kinds of circumstantial evidence of intentional discrimination: (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn;" (2) "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment;" and (3) "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief." *Troupe*, 20 F.3d at 736

A plaintiff can also create a triable issue of fact as to whether he was discriminated against on the basis of his sex and survive summary judgment through the familiar burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This analysis provides a means of evaluating indirect evidence of discrimination at the summary judgment stage. *Oest v. Ill. Dept. of Corrs.*, 240 F.3d 605, 612 (7th Cir. 2001).

The relevant examination is the same for both Title VII and § 1981. *See Scaife v. Cook*

*County*, 446 F.3d 735, 739 (7th Cir. 2006).

**A.      Sex Discrimination**

**1.      *Direct Method of Proof***

The Plaintiff contends that he can survive summary judgment on his claim of gender discrimination under the direct method of proof outlined in *Troupe v. May Department Stores*, 20 F.3d 734 (7th Cir. 1994). He asserts that the circumstantial evidence present in this case is: "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736.[3]

In an attempt to survive summary judgment, the Plaintiff compares the Defendant's treatment of him with its treatment of YSO Simmons. He argues that even though she participated in the take down of KS, YSO Simmons was not investigated and was not charged with failing to notify Sgt. Henderson of the escalating situation with KS. He also submits that she was not investigated for talking to RP's mother, who complained about YSO Simmon's communication with her. Although this evidence shows that YSO Simmons was treated differently than the Plaintiff, it says nothing of the reason for the disparity. There is nothing from this treatment alone that would allow a rational trier of fact to infer intentional discrimination based on the Plaintiff's sex given the myriad of other reason that may motivate an employer to treat two employees differently, including personal

---

[3] The Plaintiff incorporates into his discussion of sex discrimination the "discriminatory actions" that were referenced in his discussion of his race discrimination claim, which will be discussed later in this Opinion. The Plaintiff does not indicate which pieces of circumstantial evidence of race discrimination also act as circumstantial evidence of sex discrimination. The Court will only consider those pieces of evidence specifically designated as proof that his employer discrimination against him on the basis of his sex.

preference for one employee over another. And this treatment alone is all the Plaintiff offers.

The Plaintiff does not point to any derogatory statements that the Defendants made suggesting they harbored a bias against men, or favored women officers. Nor does he point to discrimination against other men or systematic better treatment of females. The element of suspicious timing is not applicable in this situation because there is no event giving rise to the protected status. *Cf. Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525–26 (7th Cir. 1998) (plaintiff argued that employer treated her differently after learning that she was pregnant). The evidence that the Plaintiff presents in an attempt to provide insight into the Defendants' motives simply does not implicate the Plaintiff's sex: Sgt. Carpenter's statement that Lt. Hapner believed the Plaintiff was "dirty" and did not want him working at the Facility after his reinstatement; and Superintendent Gibson's comments that state police informed him that they saw the Plaintiff selling crack on the corner. A fact finder could not infer from this evidence that the Defendant investigated and terminated the Plaintiff because he is a man.

Because the Plaintiff does not couple the evidence of differential treatment with the type of circumstantial evidence that would allow a jury to infer that this differential treatment was the result of intentional discrimination by his superiors, he cannot proceed with his sex discrimination claim under the direct method of proof.

## 2.    *Indirect Method of Proof*

Neither can the Plaintiff go forward under the indirect, burden-shifting method of proof. In general, to establish a prima facie case of discrimination, a plaintiff must show that: 1) he belongs to a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an

adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). However, the *McDonnell Douglas* prima facie case is modified in reverse discrimination cases because it "is the unusual employer who discriminates against majority employees." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456–57 (7th Cir. 1999). In reverse discrimination cases, the first element becomes a non-issue and the courts must be flexible in applying the indirect method of proving discrimination. *Gore v. Ind. Univ.,* 416 F.3d 590, 592 (7th Cir. 2005). "[A]dditional steps are needed before an inference of reverse-discrimination can be drawn." *Id.* at 593. To meet the first prong of the prima facie case, the plaintiff must show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against . . . [men] or evidence that there is something 'fishy' about the facts at hand." *Id.* at 592 (quoting *Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003)); *Mills*, 171 F.3d at 455, 57 (stating that a plaintiff in a reverse discrimination case must show at least one of the background circumstances to support an inference that the defendant is one of those unusual employers who discriminates against the majority). The Plaintiff has not even attempted to demonstrate the necessary background circumstances to proceed under the indirect burden-shifting method of proof.

The Plaintiff has not produced sufficient evidence in support of his claim that the Defendants discriminated against him on the basis of his sex and the Defendants are entitled to summary judgement on this claim.

**B.      Retaliation**

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3 (a). The usual way in which a plaintiff tries to establish a prima facie case of retaliation and withstand summary judgment is through an adaptation of the *McDonnell Douglas* test. This requires:

> the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). A plaintiff establishes a prima facie case of retaliation using the direct method if he "prove[s] by means of circumstantial evidence that he engaged in protected activity (filed a charge of discrimination) and as a result suffered the adverse employment action of which he complains." *Sylvester*, 453 F.3d at 902. "Both methods of proof require that the plaintiff show that he or she was retaliated against after engaging in activity protected under Title VII." *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889 (7th Cir. 2004).

The Defendants argue that the Plaintiff cannot prevail under either method of proof because he did not engage in protected activity. Gibson's August 20, 2004, decision to suspend the Plaintiff pending his termination was made two weeks before the Defendants received notice that the Plaintiff filed a charge of discrimination. In addition, the management was not aware that the Plaintiff made any other complaints, either formally or informally, that he was being discriminated against on the

basis of his race.

"It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity." *Durkin v. City of Chi.*, 341 F.3d 606, 614–15 (7th Cir. 2003) (holding that an employer cannot retaliate if there has been no protected expression because there is nothing for it to retaliate against); *see also Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004) (quoting *Durkin*). In addition, proof of the employer's knowledge of the protected activity is implicit in the first element of a prima facie case of retaliation. *Id.*, 341 F.3d at 614 n.4; *see also Treadwell v. Office of Ill. Sec. of State*, 455 F.3d 778, 782 (7th Cir. 2006) (affirming summary judgment where the plaintiff presented no evidence to contradict the defendant's assertion that it was not aware that the plaintiff filed EEOC charges).

Here, the Plaintiff does not challenge the Defendants' proof that they did not receive notice of his charge of discrimination until after making the decision to suspend the Plaintiff pending his dismissal. Instead, the Plaintiff contends that Gibson did not want to reinstate the Plaintiff in March 2004 after his termination for OWI and contemplated retaliatory action against the Plaintiff on the basis of "hearsay threats of litigation immediately following Harris' March 2004 reinstatement." (Pf.'s Mem. 21.)  The Plaintiff argues that suspicious timing between the Plaintiff's return to the Facility in March 2004 and his suspension in July 2004 supports a reasonable inference of retaliation.

The problem with the Plaintiff's argument regarding suspicious timing is that an adverse reaction, if any, to the Plaintiff's reinstatement was not a reaction to "protected activity." There is no evidence in the record that the Plaintiff's OWI termination and subsequent reinstatement involved complaints of racial discrimination. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th

18

Cir. 2006) ("Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class."). The Plaintiff's evidence that Gibson retaliated against him consists of (1) an email in which Gibson refers to threats of a lawsuit and (2) an assertion that it was "general knowledge" that the Plaintiff had complained of racial discrimination. However, the email does not reference the basis for the threatened lawsuits and the statement regarding previous complaints of discrimination is not supported by the record.

Gibson's email, which he wrote to Luzader after the July 2004 investigation into the Plaintiff's conduct was underway, stated:

> Based upon the [original seven] allegations and support, what action would you support if I find YSO Harris to be involved in one or more of these allegations? As you may remember, this is the officer that I terminated against your advise and then had to re-hire him. He has threatened me with lawsuits, etc.

Gibson testified, in response to a question about what lawsuits the Plaintiff threatened, that someone told him the Plaintiff, even after he was reinstated, was going to sue the department. (Gibson Dep. 30-31.) This email does not, as the Plaintiff argues, support a reasonable inference of retaliation. There is no indication what Gibson was told regarding the basis for any threatened lawsuits—certainly no indication that he was told the Plaintiff was going to sue for racial discrimination.[4] Thus, threats of litigation involving this event were not made in opposition to employment practices made unlawful by Title VII and cannot form the basis of a retaliation claim.

The Plaintiff's only other evidence that he engaged in protected activity and that the Facility was aware of his complaints is derived from the depositions of Carpenter and Henderson. The

---

[4] In fact, the comment about the threatened lawsuits preceded an explanation to Luzader regarding the procedural posture of the matter and the pre-deprivation procedures that he intended to follow.

Plaintiff cites their depositions in support of his statement that it was generally known that he previously complained of racial discrimination. (Pf.'s Resp. at 13.) However, the testimony cited by the Plaintiff does not support this claim. Carpenter testified that "word was out" that the administration did not want the Plaintiff back at the Facility after his termination for OWI and that Lt. Hapner thought the Plaintiff was "dirty," meaning he was "crooked." (Carpenter Dep. 100–03.) Henderson testified that the Plaintiff was "always talking about Mr. Gibson, Lieutenant Hapner and Berlin, and I believe that's something that's been going on before I even started Northeast, from what they tell me." (Henderson Dep. 38–39.) He also testified that he heard through the grapevine that the administration did not like the Plaintiff (Henderson Dep. 44), but did not indicate a reason for the purported dislike.

"Title VII was designed to protect the rights of employees who in good faith protest the discrimination they believe they have suffered and to ensure that such employees remain free from reprisals or retaliatory conduct." *Mattson*, 359 F.3d at 890. This protection was not triggered in this case because the Plaintiff did not protest discrimination before the Defendants terminated his employment.

**C.      Racial Discrimination**

**1.      *Direct Method of Proof***

a.      *The Plaintiff's Contentions*

The Plaintiff contends that "an incredible mosaic of discriminatory conduct and comments" supports his claim of race discrimination. (Pf.'s Mem. 2.) He submits that he has circumstantial evidence consisting of "suspicious timing, ambiguous statements oral or written, behavior toward

or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* (*citing Troupe*, 20 F.3d at 736).

The Plaintiff argues that the white administration, referred to as "the good old boys," was out to get the Plaintiff after his termination for OWI and subsequent reinstatement in March 2004. Lt. Hapner told Sgt. Carpenter that he did not want the Plaintiff to return to the Facility because he was a "dirty" officer. The Plaintiff submits that there was a disparity of power between the Facility's white administration and its black officers, that black officer were used as "enforcers" with the students, that black officers were passed over for promotions, that only white students' battery charges were reduced to lesser charges, that Gibson directed negative stereotypes at the Plaintiff, and that the Plaintiff was not permitted to work in the front control post while the charges against him were investigated. The Plaintiff argues that his emergency suspension and termination must be viewed in light of these incidents and the hostile environment that existed at the Facility. He also contends that the reasons for his suspension and termination were phony and pretextual.

b.      *The Plaintiff's Circumstantial Evidence Does Not Support an Inference of Intentional Discrimination*

The Defendant argues that the Plaintiff's vague, unsubstantiated allegations are insufficient to establish the Defendant's discriminatory intent. The Court agrees: much of the Plaintiff's evidence is inadmissible and the remaining evidence, even when considered in its totality and given inferences most favorable to the Plaintiff, does not point directly to a discriminatory reason for the Defendants' actions in investigating, suspending, and terminating the Plaintiff's employment.

Sgt. Carpenter testified that when the officers referred to the white administration as the "good old boys" they meant that the administration made all of the decisions and did not confer with

21

anybody outside of their circle. (Carpenter Dep. 113–14.) He admitted that they were "higher ups and they are in the position to make decisions," but thought they had an attitude of looking out for each other and not counting the rest. (Carpenter Dep. 114.)  Even if an employee's general perception, unsupported by specific instances, were admissible to prove discriminatory intent, there is no inference that race played any part in this perceived attitude. Likewise, the vague conclusion that there was a "disparity of power" between the administration and the officers is not evidence that the Defendants intentionally discriminated against black officers on the basis of their race.

> Q.   Do you remember telling me that there was a disparity of power between the white administration and the officers, which a lot of them were African-American?
> A.   I may have said that, yes.
> Q.   Do you recall that?
> A.   I think so.

(Carpenter Dep. 116.) This excerpt from Carpenter's deposition is the full extent of the testimony regarding any disparity of power.

Sgt. Carpenter's testimony that Lt. Hapner did not want the Plaintiff to return likewise does not implicate the Plaintiff's race. Carpenter said that Hapner "had a thing" for the Plaintiff and told him that he thought the Plaintiff was "dirty." (Carpenter Dep. 103.) Carpenter did not know what this meant, but stated that he took it as an implication that the Plaintiff was crooked. (*Id.*) He stated that he was puzzled by Lt. Hapner's feelings because Hapner, who was hired shortly before the Plaintiff's 2003 termination, had not worked much with the Plaintiff. Sgt. Henderson also testified that he heard through the grapevine that the administration did not like the Plaintiff, but did not suggest a reason for the dislike, much less provide any evidence that it was based on the Plaintiff's race. (Henderson Dep. 44.) Rather than support an inference that Hapner was racist, or relied on information from other racist administrators, as the Plaintiff alleges in his brief (Pf.'s Mem. 3), this

22

evidence suggests that, after the Plaintiff was terminated for an OWI,  Hapner questioned his character and whether he should be working at the Facility. While the Court is aware that, in the summary judgment context, "the ambiguities in a witness's testimony must be resolved against the moving party" *Shager v. Upjohn Co*., 913 F.2d 398, 402 (7th Cir. 1990), it is simply not reasonable to infer that Hapner's comment that the Plaintiff was dirty was a reference to his race or that his opinion of the Plaintiff was a reaction to his race, *see Parker v. Federal Nat'l Mortg. Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984) ("The district court is not required to evaluate every *conceivable* inference which can be drawn from evidentiary matter, but only reasonable ones.").

The Plaintiff claims that there was other evidence of discrimination toward black officers. Sgt. Henderson testified that black officers felt that they were enforcers with the students because the students responded differently to the white and black officers and the white officers were too timid around the students. He stated that a couple of white officers could deal with the kids, but some just caused things to escalate requiring other officers to restrain them. (Henderson Dep. 56–58.) The Plaintiff testified that he was asked to calm and neutralize student situations on numerous occasions for white officers, but the white officers were never written up for failing to perform their jobs. (Harris Dep. 81.) This testimony does not support an inference that the Defendants intended to discriminate against the Plaintiff and other black officers on the basis of their race, particularly in relation to decisions regarding investigations, suspensions, and terminations. First, Henderson's statement that black officers felt that they were enforcers is not supported by specific instances. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (stating that conclusory allegations, unsupported by specific facts, will not create genuine issues for trial). Second, the testimony from Henderson and the Plaintiff is not related to the adverse employment decision at

issue in this case. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (holding that there was no specific evidence linking the employer's alleged bigotry to the plaintiff's termination); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[B]igotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action."); *cf. Mlynczak v. Bodman*, 442 F.3d 1050, 1058 (7th Cir. 2006) (evidence that a decisionmaker generally favored hiring minorities does not prove under the direct method that any particular decision he made was for discriminatory reasons). The Plaintiff does not even suggest who within the Facility allowed or encouraged such roles. Moreover, Sgt. Henderson explained that it was officers' timidity and students' responses, not race, that accounted for the fact that black officers were called on more often to restrain students.

The Plaintiff relies heavily on the testimony of YSO Crusoe in support of his claim that he was discriminated on the basis of his race. Crusoe testified that both he and the Plaintiff were passed over for promotions to Sergeant and a person with less seniority was given the job. (Crusoe Dep. 20.)[5] He contends that during the time that they applied for the position, an investigation involving the Plaintiff and a student was taking place but he "strongly believed the kid was lying about the investigation; I know he was." (Crusoe Dep. 20.) He believed the student lied about something the Plaintiff did and believed that "it" was manufactured so that the Plaintiff could not be promoted. (Crusoe Dep. 21.) His explained why he believed this:

> Well, I remember Gary Berlin coming out of the treatment room. I guess he must have talked to [the student] and made the statement, 'There is someone messing with his investigation.' At that time, I was working, it has been years ago, but I am thinking that the truth must have come out and Mr. Berlin had a hard time believing the truth, . . . .

---

[5] Crusoe does not provide any details regarding his own efforts to be promoted.

(Crusoe Dep. 21.) The implication of this testimony is that the student changed his story and that Berlin attributed this to someone interfering with his investigation instead of believing that the student had fabricated his original story. Having made this inference, the evidence is nonetheless not admissible for the Plaintiff's intended purpose. Crusoe's testimony that the events were fabricated so that the Plaintiff could not be promoted is not based on personal knowledge, but is inadmissible speculation. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). A plaintiff cannot avoid summary judgment by speculating as to the employer's state of mind.  *Payne*, 337 F.3d at 772. Even if Crusoe's observations could support his conclusion that the student fabricated his account, it is pure speculation to suggest that the Defendants orchestrated such a lie or were even aware that the student was lying when the Sergeant position was available. In addition, the Plaintiff has not presented any evidence that he was otherwise qualified to be promoted.

Crusoe also provided testimony regarding Lt. Hapner's treatment of him on one occasion. He testified that Lt. Hapner falsely accused him in 2005 of leaving students alone in a bathroom, even though a videotape of the incident showed that a female officer was guilty of the infraction. The female was also black, but did not resemble Crusoe at all. Crusoe testified that he thought the tape or recording equipment was faulty. Later that same day, Lt. Hapner told Crusoe that he was

25

right, that it was not Crusoe on the video, but did not apologize to Crusoe. The Plaintiff does not explain how Lt Hapner's failure to accuse the correct officer, who was also African-American, is evidence of racial discrimination.

Crusoe did testify that he thought it was racial discrimination when three white administrators discounted his eyewitness account of an event and reduced a student battery charge to a lesser charge of threatening and intimidating. When asked if he believed that if he was white they would not have questioned him and reduced the battery to threatening and intimidating, he said that he did not know—he just did not understand why the battery was reduced. (Dep. 35–36.) But again, any element of racial bias is missing. In fact, when Crusoe wrote about the mistaken accusation and the reduction of charges in a letter to the union steward, he stated that he believed the Facility had changed into a hostile environment and that the combination of the above two events made his job unsafe. He did not indicate that the environment was hostile because of his race.

The Plaintiff also argues that the racial discrimination at the Facility leached down to the student population. However, his assertion is not supported by admissible evidence. Sgt. Henderson and YSO Crusoe testified that they felt that white student's accused of battery were more likely to have their charges lessened to horseplay than black students were. Crusoe thought that white students were treated better seventy-five percent of the time. (Crusoe Dep. 26.) Again, these allegations are not supported by specific instances. Nor do Sgt. Henderson or YSO Crusoe demonstrate that they have personal knowledge of all the charges brought against students and the specific details of those charges. *See* Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

26

The Plaintiff, for the first time in his presentation of circumstantial evidence, turns to the decisionmaker when he contends that Gibson made two comments that evidenced his discriminatory intent. The Plaintiff testified that during the predeprivation hearing for his 2003 OWI, Gibson told him that he received a call that the Plaintiff was on the corner selling TVs for crack cocaine. During his emergency suspension hearing in July 2004, Gibson again told that Plaintiff that he got a call from a State Trooper who told him he saw the Plaintiff on the corner selling crack cocaine to kids. The Plaintiff believed that there was no basis for either comment and that they were negative African American cultural stereotypes. The Plaintiff cannot rely on his subjective belief that Gibson's comment was racially motivated to create a genuine issue of material fact. *See McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989) (stating that the plaintiff's subjective belief that the defendant was racially biased was insufficient to create a genuine issue of material fact). The Defendant argues that the comments are not related to the Plaintiff's race. Indeed, the comments do not overtly refer to race and do not directly implicate a racial motivation. However, in certain contexts they could have a racial character or purpose or implicate a negative attitude toward African-Americans. *Cf. Lucki v. Ameritech Corp.*, 389 F.3d 708, 713–14 (7th Cir. 2004) (noting that conduct must have racial character or purpose to support hostile work environment claim); *Hardin v. S.C. Johnson & Sons, Inc.*, 167 F.3d 340 (7th Cir. 1999) (analyzing whether remarks had discriminatory character).

Although the comment was in no way complimentary, it does not appear that the purpose of the remarks was discriminatory—but rather was to inform the Plaintiff about something Gibson heard. It is reasonable to infer from the context and timing of the comments that Gibson's purpose for making them had to do with the fact that the Plaintiff was alleged to have engaged in other wrong

27

doing, including criminal activity (OWI)—not to the fact that he was African-American. The ambiguities are not enough, given the totality of circumstances, to infer intentional discrimination under the direct method of proof. In addition, the comments were not made in reference to the adverse employment action. *See Gorence*, 242 F.3d at 762 (holding that discriminatory feelings of decisionmakers must be expressed around the time of and in reference to the adverse employment action complained of).

The Plaintiff also maintains that a white officer in his position would not have been suspended pending termination, but would have been placed in the front office. Sgt. Henderson testified that he saw both white and black officers pulled off the floor and put in the front control post office during an investigation and was surprised when the Plaintiff was suspended instead of moved to the front office. (Henderson Dep. 58–59.) YSO Crusoe testified that when Jeff Foust, a white YSO, was investigated, he was placed in the front control post. (Crusoe Dep. 17.) After he was cleared of the charges, he was put back on the floor, but was again placed in the control post while another alleged wrong doing was investigated. (Crusoe Dep. 18.) Crusoe did not indicate that he had any knowledge about what Foust was being investigated for or his previous employment history. Much like the evidence the Plaintiff submitted regarding YSO Simmons, there is no indication as to what motivated the differential treatment, and certainly no evidence to indicate it was because of the Plaintiff's race. Crusoe does speculate that he also would have been fired instead of moved to the front post, but such speculation is not admissible for purposes of summary judgment.

The Plaintiff has not produced sufficient admissible evidence to create a triable issue whether his termination was motivated by discrimination. The Plaintiff's evidence is largely irrelevant to the Defendants' intent, is inadmissible, or does not demonstrate racial bias. As such, it would not allow

a reasonable jury to infer that the Defendants suspended and terminated the Plaintiff because of his race. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001) ("[I]t is simply not true . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero.").

c.    *Evidence Does not Point to Decisionmaker*

The Plaintiff's circumstantial evidence suffers from another defect. Much of it does not point to Gibson, the decision-maker, or to Sgt. Sorg, the investigating officer, but instead implicates Lt. Hapner. Even if the trier of fact were to believe that Lt. Hapner was biased against African-Americans, there is no evidence that he conducted or influenced the investigation of the charges that led to the Plaintiff's termination. *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (describing evidence that would allow a jury to infer intentional discrimination "by the decisionmaker.") (citing *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)). The Plaintiff does not contest that Gibson was the ultimate decisionmaker, but, citing the "cat's paw" theory set forth in *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990), argues that the Defendants are liable because Gibson acted as a conduit for the prejudice of Lt. Hapner and Sgt. Sorg. (Pf.'s Mem. 13–14.) However, there is no evidence in the record that Sgt. Sorg himself was biased or that Lt. Hapner influenced Sgt. Sorg's investigation or his findings. Sorg testified that during an investigation he gathers information and reports the policy violations that occurred. Then the superintendent reviews his report and decides what charges will be brought. (Sorg Dep. 27–28.) The Plaintiff does not present evidence that this procedure was not followed in the Plaintiff's

29

investigation. The Plaintiff submits only that Lt. Hapner was Sorg's supervisor, they worked in the same office, and they had a good working relationship. Sorg's relationship with Hapner is not evidence that Sorg gave Hapner control of his investigation. Thus, even if the findings from the investigation were the sole basis for Gibson's decision, there is no evidence that Sorg did not conduct an independent investigation untainted by Hapner's alleged bias

However, even if Lt. Hapner's alleged biased affected the investigation, there is no evidence that Gibson simply rubber stamped Sorg's findings. *See Davis v. Con-Way Trasp. Cent. Express, Inc.*, 368 F.3d 776, 783–84 (7th Cir. 2004) (finding that because there was no evidence that the ultimate decision maker "rubber stamped" the termination recommendation, the "cat's paw" theory is inapplicable). Rather, Gibson conducted a predeprivation hearing and consulted with the Director of Labor Relations. In fact, after the predeprivation meeting and his consideration of the Plaintiff's responses and all the reports and statement, Gibson determined that he did not have grounds to pursue and take action on three of the seven allegations. (Gibson Dep. 24.) When an employment decision is made on an independent and legally permissive basis, the bias of a subordinate is not relevant. *Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 708 (7th Cir. 2005).

## 2.    *Indirect Method of Proof*

Where evidence does not point directly to a discriminatory reason for an employer's action, the plaintiff must proceed under the well-known indirect route. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). In a claim for discrimination, the employee must present evidence that "(1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations at the time of the alleged adverse action; (3) he was subjected to an adverse employment action; and

30

(4) the employer treated similarly situated employees not in the protected class more favorably." *Scaife*, 446 F.3d at 739. If the plaintiff is not able to establish each element of this prima facie case, the court must enter summary judgment for the defendant. *See Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002).

The Plaintiff fails to establish that he was treated less favorably than a similarly situated employee of a different race when Gibson suspended and terminated him. The Plaintiff must point to an employee that is similarly situated in regard to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). This normally involves a showing that the comparable employee dealt with the same supervisor, was subject to the same standards, and "engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617–18.

The Plaintiff submits that Sgt. Carpenter is a comparable employee outside the protected class. Sgt. Carpenter is Caucasian. However, Sgt. Carpenter, unlike the Plaintiff, was not investigated for failing to contact a supervisor prior to using force or for interfering with an investigation. The Plaintiff contends that Sgt. Carpenter should have been investigated for his part in the incident involving KS. That is, if the accounts of excessive force were true, Sgt. Carpenter was arguably guilty of standing by and failing to help KS, a violation of the DOC's Standards of Conduct.

Sgt. Carpenter's role in the KS take down was not the same as the Plaintiff's role and this difference is sufficient to distinguish the employer's treatment of them. Sgt. Carpenter was not involved with KS until after the situation escalated to the point that the Plaintiff and YSO Simmons had to use force. Thus, it would not have been appropriate to charge him with failing to notify a

supervisor before using force. Moreover, Sgt. Carpenter, as a supervisor himself, would not have been required to provide such notification.

On July 12, Sgt. Henderson concluded that the use of force was justified. The Defendants did not investigate whether the level of physical force used was necessary; they only reported it to the CPS, which is not an adverse employment action at issue in this case. Because the Defendants did not investigate whether the Plaintiff actually used excessive force, an investigation into whether Sgt. Carpenter failed to stop the use of excessive force would not have been appropriate either. In addition, a claim of excessive force is different than a claim of failure to stop another from using excessive force, both in the severity of the charge and the evidence that would support such a claim. The undisputed evidence is that when Sgt. Carpenter became involved he subdued the situation by calming KS and telling the Plaintiff to let go of KS and to leave the dorm. Sgt. Carpenter was not "directly comparable" to the Plaintiff "in all material respects." *Brummett v. Sinclar Broad. Group, Inc.*, 414 F.3d 686, 682 (7th Cir. 2005).

The Plaintiff argues that the Defendants' reasons for terminating him were pretexual. He includes this argument, not as part of the *McDonnell Douglas* burden-shifting formula, but in the section of his brief setting forth his circumstantial evidence of discrimination. Yet he cites the standard for pretext that applies after a plaintiff carries his burden on the prima facie case using the indirect method of proof. (Pf.'s Brief 7.) Indeed, a court does not reach the pretext stage unless the plaintiff first establishes a prima facie case of discrimination and the employer has set forth a nondiscriminatory reason for the adverse employment action. *See Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). In *Coco*, the Seventh Circuit held that if a plaintiff does not have direct evidence of discrimination and is dependent on the *McDonnell Douglas* formula, he cannot

32

defeat summary judgment by merely proving that he was fired for a reason unrelated to his deficiencies; that evidence would only defeat summary judgment if the plaintiff has first made out a prima facie case of discrimination. 128 F.3d at 1180.

Here, the plaintiff has not made out a prima facie case of discrimination. Thus, any evidence that he was fired for reasons unrelated to the events of July 12 and his interaction with the parents of a student who witnessed the event is not relevant.

### D.        Hostile Work Environment

The Plaintiff offers no independent analysis or argument of his hostile work environment claim. The only mention of this claim is found in a heading: "Harris' Claims of Race and Gender Discrimination, Hostile Work Environment and Retaliation Are Supported by Direct and Indirect Evidence." (Pf.'s Mem. at 1. ) Presumably, the Plaintiff believes that the circumstantial evidence that supported his claim of race discrimination also supports his claim that he was subject to a hostile work environment. The same evidence that was insufficient to defeat summary judgment on the Plaintiff's discrimination claim, is insufficient evidence of a harassing environment that was so severe or pervasive that it altered the conditions of his employment and created an abusive working environment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). No reasonable jury could conclude that the incidents about which the Plaintiff complains amounted to a hostile work environment and the Defendant is entitled to summary judgment on that claim.

### CONCLUSION

33

For the foregoing reasons the Defendants' Motion for Summary Judgment [DE 20] is GRANTED. Count III, the Plaintiff's due process claim, is no longer pending pursuant to the parties' stipulation for dismissal of that claim [DE 15]. The Clerk will enter judgment in favor of the Defendants and against the Plaintiff.

SO ORDERED on December 18, 2006.


 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT